[Cite as *Moosehead v. Eureka*, 2019-Ohio-3961.]

# IN THE COURT OF APPEALS OF OHIO

### SEVENTH APPELLATE DISTRICT
### MONROE COUNTY

### MOOSEHEAD HARVESTING, INC.

Plaintiff-Appellant,

v.

### EUREKA MIDSTREAM, LLC f/k/a
### EUREKA HUNTER PIPELINE, LLC

Defendant-Appellee.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 18 MO 0015**

---

Civil Appeal from the
Court of Common Pleas of Monroe County, Ohio
Case No. 2016-299

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed in part. Reversed and Remanded in part.

---

*Atty. R. Russell O'Rourke, Atty. R. Scott Heasley*, Meyers, Roman, Friedberg & Lewis, 28601 Chagrin Blvd., Suite 600, Cleveland, Ohio 44122, for Plaintiff-Appellant.

*Atty. Ramonda C. Marling*, Lewis Glasser PLLC, 300 Summers Street, Suite 700, Charleston, West Virginia 25301, for Defendant-Appellee.

Dated: September 30, 2019

--------------------

**WAITE, P.J.**

**{¶1}** Appellant Moosehead Harvesting, Inc. ("Moosehead") appeals an August 16, 2018 Monroe County Court of Common Pleas decision to grant summary judgment in favor of Appellee Eureka Midstream, L.L.C. ("Eureka"). Moosehead argues that Eureka was unjustly enriched by clearing and excavation work completed by Moosehead for which Moosehead was not paid. For the reasons provided, Moosehead's arguments have merit in part. Accordingly, the judgment of the trial court is reversed only as to the distribution of retainage money, but affirmed as to the determination that Moosehead was not entitled to the full value of its contract. The matter is remanded for a limited hearing to determine how much of the retainage money Moosehead is entitled to.

Factual and Procedural History

**{¶2}** Eureka planned to build a natural gas pipeline, referred to as the "Bobcat and Jaws Pipeline" ("pipeline"). To install the pipeline, Eureka hired Carl Smith Pipeline Energy Group, Inc. ("CSP"). The agreement between Eureka and CSP was the "prime contract." Under the terms of the contract, Eureka was to pay CSP $12,000,000 for installation of the pipeline. However, at some point CSP agreed to give Eureka discounts, which lowered its invoice amounts, in exchange for early payments from Eureka. The prime contract allowed Eureka to withhold ten percent of each invoice as retainage.

**{¶3}** The pipeline could not be installed until a right-of-way was cleared. CSP hired Moosehead as its subcontractor to perform the necessary excavation and to clear the right-of-way. The CSP/Moosehead subcontract provided that Moosehead was to be paid $808,538.15 so long as its work was timely completed.

**{¶4}**   Moosehead began work on June 15, 2015 and finished on July 14, 2015, which was timely under the contract.  Both Eureka and CSP approved Moosehead's work.  Moosehead submitted an invoice in the amount of the agreed price, $808,538.15.  However, CSP paid Moosehead only $125,000, fifteen percent of the total amount due.  Moosehead contacted CSP to inquire about the outstanding balance and CSP told Moosehead that Eureka had been slow in remitting payments to CSP, which resulted in the delay of complete payment to Moosehead.  However, when Moosehead contacted Eureka about its payment, Eureka claimed that a check for the total amount had already been paid to CSP.

**{¶5}**   On September 18, 2015, Robert Reed of Moosehead called an official at Eureka and requested the remainder of the outstanding balance.  On October 9, 2015, Moosehead's counsel sent a letter to Eureka requesting that future payments to CSP be withheld until the outstanding balance to Moosehead was satisfied.  Eureka then sent a letter to CSP stating its intent to withhold future payments until CSP obtained a lien waiver from Moosehead.  CSP did not obtain any wavier and Eureka began withholding CSP's payments.

**{¶6}**   At some point, Eureka penalized CSP $1.3 million for failing to complete the project on time pursuant to the terms of their prime contract.  It is unclear whether Eureka received payment of the penalty amount from CSP.  On February 5, 2016, CSP filed a voluntary Chapter 7 Bankruptcy Petition in the United States Bankruptcy Court for the Middle District of Tennessee.  The bankruptcy court initially placed a stay on the available retainage money, which amounted to $484,114.78.  The bankruptcy court ultimately lifted the stay and permitted Eureka to distribute these funds.  Using the retainage, Eureka paid

the following vendors: Henderson's GreenPro ($321,129.50), Bare Fencing ($10,000), J&J Timber ($15,000), and Iron Eagle Enterprises ($60,000). The total amount paid to these vendors was $406,129.50. According to an affidavit from Eureka representative Charles D. King, Eureka kept the remaining $77,985.28 as compensation to Eureka for losses suffered as a result of CSP's failure to timely complete the project. At oral argument, Eureka confirmed that it kept the remainder of the retainage money and used the money to offset costs it incurred in hiring a new contractor to complete the project.

**{¶7}** On September 19, 2016, Moosehead filed a "complaint for foreclosure of mechanic's lien and unjust enrichment" against Eureka, EM Energy Ohio L.L.C., EM Energy Midstream L.L.C., and EM Employer L.L.C. It appears that the codefendants are subsidiaries of Eureka. Count one of the complaint alleged that Eureka had been unjustly enriched by the completion of Moosehead's clearing and excavation work without payment. The second claim sought foreclosure of a mechanic's lien. On November 4, 2016, Eureka filed a response to the complaint and counterclaimed for breach of contract.

**{¶8}** On June 1, 2017, the trial court denied Eureka's motion to dismiss the unjust enrichment claim. On August 15, 2017, the trial court denied a second such motion. On May 2, 2018, the trial court denied Moosehead's request to amend the complaint to add a breach of contract claim. In July of 2018, pursuant to an agreement by the parties, Moosehead dismissed the claim involving a mechanic's lien and Eureka withdrew its counterclaim.

**{¶9}** On July 3, 2018, Eureka filed a motion for summary judgment on the unjust enrichment claim, the sole remaining count of the complaint. Moosehead did not file a competing motion for summary judgment. On August 16, 2018, the trial court granted

Eureka's motion for summary judgment. It is from this entry that Moosehead timely appeals.

<u>ASSIGNMENT OF ERROR</u>

THE TRIAL COURT ERRED AS A MATTER OF LAW IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS GENUINE ISSUES OF MATERIAL FACT RELEVANT TO THE DISPUTE REMAINED.

**{¶10}** Moosehead generally argues that it is entitled to receive the full unpaid contract price from Eureka, as Eureka was unjustly enriched by Moosehead's completion of clearing and excavation work, the prerequisite for Eureka to begin work on the pipeline. Although Eureka benefitted from the completion of Moosehead's work, it made no attempt to compensate Moosehead even though Eureka had money available due to the retainage, discounts, and penalty clause payment. Moosehead also argues that Eureka used retainage money to pay other unpaid subcontractors but ignored the outstanding claim by Moosehead. Additionally, Moosehead argues that Eureka improperly entered into side deals, where CSP agreed to reduce invoice amounts (presumably including the Moosehead invoice) in exchange for early payments.

**{¶11}** Eureka responds that the Moosehead contract included a waiver of lien, meaning that Moosehead could not place a lien on either CSP or Eureka. Hence, Eureka believes that Moosehead is not entitled to any portion of the retainage money, which it claims is reserved only for lienholders. Eureka cites to several cases from Ohio appellate courts which have held that once payment is made to a contractor, the subcontractor cannot collect from the owner. See *Wickford Metal Products v. Tri-Valley Church*, 5th

Dist. Licking No. 98CA47, 1999 WL 3973 (Dec. 1, 1998); *Steel Quest v. City Mark Construction Services, Inc.*, 1st Dist. Hamilton No. C-960994, 1997 WL 674614 (Oct. 31, 1997.) Because Eureka paid Moosehead's invoice to CSP, Eureka argues that Ohio law prohibits Moosehead from now collecting any unpaid balance from Eureka.

**{¶12}** Moosehead's complaint rested on the equitable theory of unjust enrichment. "[T]he elements of unjust enrichment are '(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ("unjust enrichment").' " *Filo v. Liberato*, 2013-Ohio-1014, 987 N.E.2d 707, ¶ 35 (7th Dist.), citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984).

**{¶13}** When a subcontractor is not paid by the contractor and the owner has not paid the contractor for some aspect of the job at issue, the subcontractor can look to the owner for payment under a theory of unjust enrichment. *Meridien Marketing Group, Inc. v. J & E Bldg. Group, Inc.*, 2d Dist. Miami No. 2011-CA-02, 2011-Ohio-4872, ¶ 30, citing *Ross-Co Redi Mix Co. v. Steveco*, Inc., 4th Dist. Pickaway No. 95CA3, 1996 WL 54174 (Feb.6, 1996); *Brower Prods. Inc. v. Musilli*, 2d Dist. Miami Nos. 98CA58 and 98CA59, 1999 WL 317122 (May 21, 1999).

**{¶14}** However, when "the owner has paid the general contractor in full for all performance rendered at the construction site, the owner has not received a benefit for which it has not paid. Consequently, the owner has not been unjustly enriched." *Steel Quest, Inc. v. City Mark Const. Services, Inc.*, 1st Dist. Hamilton No. C-960994, 1997 WL 674614, *1 (Oct. 31, 1997), citing *Fairfield Ready Mix v. Walnut Hills Assoc., Ltd.*, 60 Ohio

App.3d 1, 3, 572 N.E.2d 114 (1st Dist.1988); *Banks v. Cincinnati*, 31 Ohio App.3d 54, 57, 508 N.E.2d 966 (1st Dist.1986). See also *Geis Construction, Inc. v. Warren Concrete & Supply Co.*, 11th Dist. Trumbull No. 2014-T-0014, 2014-Ohio-4319.

{¶15} According to the established law in Ohio, Eureka argues that because it paid CSP for Moosehead's work, Eureka has not been unjustly enriched. The fact that Eureka received "extra" money from discounts and penalties is irrelevant, as Eureka paid CSP for the Moosehead invoice. The record shows, however, that Eureka withheld retainage in making payment to CSP. Arguably, Eureka did not make full payment of Moosehead's contract price to CSP. While Moosehead clearly seeks to be paid its contract price in full, under the theory of unjust enrichment it is not entitled to the full contractual price, but only to any amount by which Eureka has been unjustly enriched. The question becomes whether Moosehead is entitled to any recovery from Eureka.

{¶16} The purchase order between Eureka and CSP specifies that Eureka "will retain 10% on all invoices. Retention will be returned on schedule agreed by Owner [Eureka] and Contractor [CSP]." (6/28/18 Eureka MSJ, Exh. 2, p. 1.) Eureka admittedly withheld ten percent retainage money from payment of the contract between CSP and Moosehead. Thus, the record reflects that Eureka did not pay the entire Moosehead contract price to CSP.

{¶17} Also, once Moosehead informed Eureka of CSP's failure to pay the complete invoice amount, Eureka sent CSP a letter stating that future payments to CSP would be withheld until the issue regarding Moosehead's payment issue was resolved. The letter stated, in relevant part: "[t]he current retainage balance for this project is currently $400,379.52. Thus, the retainage will not be sufficient to satisfy Moosehead

Case No. 18 MO 0015

Harvesting's potential lien with regard to its work on this project." (11/3/15 Letter.) The record reveals that CSP did not resolve the issue and Eureka did not remit further payments to CSP, adding to any retainage extra money due to the failure to pay Moosehead.

{¶18} On February 5, 2016, CSP filed a voluntary Chapter 7 Bankruptcy Petition in the United States Bankruptcy Court for the Middle District of Tennessee. Eureka held $484,114.78 in retainage on the Bobcat and Jaws Project at the time of the bankruptcy proceedings. The bankruptcy court initially executed a stay on the retainage funds, but later lifted the stay and allowed Eureka to distribute the funds among the various subcontractors who had not received full payment from CSP. Although it is unclear in what manner distribution was calculated, the following payments were made to unpaid subcontractors: $321,129.50 to Henderson's GreenPro; $60,000 to Iron Eagle Enterprises; $15,000 to J&J Timber; and, $10,000 to Bare Fencing. The total amount paid to this group of subcontractors amounted to $406,129.50. Eureka admits it kept the remaining $77,985.28 as compensation for money spent to hire a second contractor to complete the project. It is clear that none of the retainage money was distributed to Moosehead.

{¶19} Eureka argues that Moosehead is not entitled to any portion of the retainage because Moosehead's contract included a lien waiver. Eureka maintains that retainage money is solely to be used for the purpose of satisfying liens. However, Eureka conceded at oral argument that the record is devoid of any document that specifies for what purposes the retainage money at issue was to be held in reserve. R.C. 4113.61 governs "payments to subcontractors, material suppliers, and laborers." While the statute applies

to public contract work, as it is the only authority on the issue of retainage money, it does supply some guidance in this matter. In relevant part, R.C. 4113.61(A)(1)(b) provides:

> The contractor may reduce the amount paid by any retainage provision contained in the contract, invoice, or purchase order between the contractor and the subcontractor or material supplier, and may withhold amounts that may be necessary to resolve disputed liens or claims involving the work or labor performed or material furnished by the subcontractor or material supplier.

**{¶20}** The language of the statute provides that money may be retained to "resolve disputed liens or claims." (Emphasis added.) While Moosehead may not have been a lienholder, it was certainly a claimant. The parties could have contracted for retainage to be held only for the benefit of lienholders. Eureka concedes, however, that there is nothing within this record to demonstrate that such agreement was reached. Thus, there is nothing within this record limiting payment of retainage to only lienholders.

**{¶21}** Eureka admits that it kept $77,985.28 of the retainage money as compensation for losses on the project that resulted from hiring a replacement for CSP. However, there is nothing within any relevant contract or in any statute that would entitle Eureka to, in effect, pay itself using the retainage money. In fact, retainage consists of money owed by the owner (Eureka) to the contractor (CSP). It is held solely for the purpose of resolving any possible payment issues that may arise with a subcontractor. Thus, by law, if there were no claims or liens in this matter the retainage money was required to have been fully paid to CSP, not retained in any manner by Eureka.

Case No. 18 MO 0015

Ultimately, there were several issues of nonpayment to subcontractors, Moosehead among them. This record indicates, however, that no part of the retainage was legally owed to Eureka. The fact that Eureka lost money because it had to hire a second prime contractor to complete CSP's task is completely irrelevant, here. Retainage was held on work performed. There is no dispute that Moosehead and the other subcontractors performed according to their contracts. While Moosehead may not be able to collect all monies due under its contract with CSP, it is entitled to a portion of the retainage that was held for the very purpose of resolution of nonpayment. Eureka, however, had no claim on the retainage, because it seeks to use the money, not to pay for work performed, but to reimburse itself as owner of the project for costs associated with ensuring project completion once the prime contractor breached its agreement.

**{¶22}** As such, Moosehead is entitled to at least a portion of the remaining $77,985.28 of the retainage money. The record does not reflect how the payment to various subcontractors was calculated and paid once the retainage money was released by the bankruptcy court. It appears that each unpaid subcontractor may have settled for the amount it received. In the event that money was distributed through a pro rata method, however, each of these parties may also be entitled to some additional portion of the remaining retainage money. Consequently, this matter is remanded for a hearing limited to determining how much of the remaining retainage money Moosehead is entitled to and whether the other subcontractors are also entitled to a portion of that money. Accordingly, Appellant's assignment of error has merit in part and is sustained in part.

<u>Conclusion</u>

**{¶23}** Moosehead argues that Eureka was unjustly enriched by work completed by Moosehead for which they were not paid.  For the reasons provided, Moosehead's arguments have merit in part.  Accordingly, the judgment of the trial court is affirmed as to Moosehead's request to be paid its full contractual amount and reversed as to distribution of the remaining retainage money.  The matter is remanded for a limited hearing to determine how much of the remaining retainage money Moosehead is entitled to and whether the other subcontractors may be entitled to any portion of that money as well.

Robb, J., concurs.

D'Apolito, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is sustained in part and overruled in part. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, is affirmed in part and reversed in part. This matter is remanded for a limited hearing to determine how much of the remaining retainage money Moosehead is entitled to and whether the other subcontractors may be entitled to any portion of that money as well. Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**